FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

2019 MAY 15  P 1: 20

WILLIAM W. BLEVINS
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**FELONY**

**BILL OF INFORMATION FOR CONSPIRACY TO
COMMIT BANK FRAUD AND NOTICE OF FORFEITURE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET NO. **19-00090** |
| v. | * | SECTION: **SECT. I MAG. 1** |
| KENNETH CHARITY | * | VIOLATION: 18 U.S.C. § 1349 |
| | * | |

\*   \*   \*

The First Assistant United States Attorney, Michael M. Simpson, as the Attorney for the United States, acting on the authority conferred by Title 28, United States Code, Section 515, (hereinafter, "the Attorney for the United States") charges that:

**COUNT 1 – Conspiracy to Commit Bank Fraud**

A.  **AT ALL MATERIAL TIMES HEREIN:**

1. First NBC Bank was a financial institution, as defined in Title 18, United States Code, Section 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with federally insured deposit accounts.



Fee _USA_
Process _____
X Dktd _____
__ CtRmDep _____
__ Doc. No. _____

2. First NBC Bank was established in or about 2006, with its headquarters in New Orleans, Louisiana, which was within the Eastern District of Louisiana. At various times First NBC Bank maintained branch offices in Louisiana, Mississippi, and Florida.

3. First NBC Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. Bank President A was a founder of First NBC Bank and acted as its president and Chief Executive Officer from in or around May 2006, until in or around December 2016.

4. In or around May 2013, First NBC Bank Holding Company became a publicly-traded company listed on the NASDAQ.

5. On or about April 28, 2017, First NBC Bank was closed by the Louisiana Office of Financial Institutions. The FDIC was named Receiver.

6. From in or around February 2007 through in or around April 2017, the defendant, **KENNETH CHARITY ("CHARITY")**, had a banking relationship with First NBC Bank, individually and through certain entities.

7. Nominee D was a physician and friend of **CHARITY**'s who lived and practiced medicine in the Washington, D.C. suburbs. Nominee D was not **CHARITY**'s sister by blood, marriage, or adoption.

8. Nominee D was the sole member of MO78255, a limited liability company, registered with the Louisiana Secretary of State, and domiciled in Mandeville, LA.

9. **CHARITY** was the sole member of the limited liability companies DMK Group Three, DMK Group Five, 190W1515, DMK Acquisitions & Properties, and 21W104, and had power of attorney to act on behalf of MO78255 (collectively "the Entities").

10. Nominee D was not a signatory on any of the accounts held by **CHARITY** or the Entities at First NBC Bank.

11. From in or around February 2007 through in or around September 2016, Bank President A acted as **CHARITY**'s loan officer and the loan officer to the Entities.

12. The defendant, **CHARITY**, had an obligation to provide accurate personal financial statements and collateral summaries prior to any advances, renewals, or increases in loans extended to him or the Entities.

13. When **CHARITY** submitted financial statements to First NBC Bank on his own behalf or on behalf of the Entities, he and others, including, Bank President A, caused these supporting documents to be placed into First NBC Bank's records.

14. By the time First NBC Bank failed in late April 2017, the balances on the loans issued to **CHARITY** and the Entities totaled more than $18 million.

**B.    CONSPIRACY TO COMMIT BANK FRAUD:**

Beginning at a time unknown to the Attorney for the United States, but at least in or around 2006, through in and around April 2017, in the Eastern District of Louisiana and elsewhere, the defendant, **KENNETH CHARITY**, and others known and unknown to the Attorney for the United States, did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States of America, that is: to knowingly and with intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by, and under the custody or control of First NBC Bank, by means of false and fraudulent pretenses, representations, and promises, relating to a material fact, in violation of Title 18, United States Code, Section 1344.

**C.     THE PURPOSE OF THE CONSPIRACY:**

The purpose of the conspiracy was for the defendant, **CHARITY**, Bank President A, and others to unjustly enrich themselves by disguising the true financial status of **CHARITY** and the Entities, concealing the accurate performance, and misrepresenting the purpose of the loans made to **CHARITY** and the Entities.

**D.     MANNER AND MEANS OF THE CONSPIRACY:**

The manner and means by which the defendant, **CHARITY**, and Bank President A, and others sought to accomplish the purpose of the conspiracy included the following:

*False Personal Financial Statements*

1.     The defendant, **CHARITY**, Bank President A, and others provided First NBC Bank with materially false and fraudulent personal financial statements, which, among other things, overstated the value of **CHARITY**'s assets, understated his liabilities, and omitted material information. In truth and in fact, no such trust existed.

2.     For example, personal financial statements signed by **CHARITY** in 2010, 2011, and 2012, falsely claimed that **CHARITY** had assets from his father's trust in the amount of $350,000.

3.     A personal financial statement signed by **CHARITY** in 2010 and 2011 falsely listed that **CHARITY** and the Entities were entitled to millions of dollars from a government program. In truth and in fact, these were only projections of possible grant proceeds that never materialized.

4.     Schedules appended to the personal financial statements in 2010, 2011 and 2012 falsely included income from rental properties on residential units that had never been rented. Both Bank President A and **CHARITY** were aware that these rental income schedules were false.

5. Bank President A advised **CHARITY** on how to complete the personal financial statements, suggesting he include assets that both **CHARITY** and Bank President A knew were false and overstated.

6. The materially false and fraudulent personal financial statements, collateral summaries, and other documents disguised **CHARITY**'s true financial condition.

*Loan Masking*

7. Bank President A and others disguised **CHARITY**'s true financial condition by, among other things, issuing new loans to **CHARITY** and the Entities, which would pay older loans that **CHARITY** was otherwise unable to repay. The new loans would then appear to be current and performing, while the old loans appeared to have been paid. In reality, **CHARITY** had insufficient income and cash flow to support his debt at First NBC Bank. Bank President A was well-aware that **CHARITY** was unable to repay his loans, yet Bank President A continued to falsely represent in bank records that **CHARITY** and his Entities were profitable.

*False Statements About Loan Purpose*

8. An additional manner and means of carrying out the conspiracy was that **CHARITY**, Bank President A, and others repeatedly lied in bank loan documents about the purpose of loans that Bank President A approved for **CHARITY** and the Entities.

   a. *Decatur Street Canopy*

9. In or around July 2008, **CHARITY**, through one of the Entities, DMK Group Three LLC, purchased the commercial property located at 620 Decatur Street in the French Quarter using loan proceeds from First NBC Bank. Nominee D was listed as a guarantor on the loan. From on or about March 30, 2012 through on or about April 31, 2017, a beignet shop leased the space from **CHARITY** and his Entity.

10. In August of 2014, Bank President A approved a loan increase of approximately

$980,000 for **CHARITY** and Nominee D to enclose the outdoor patio at the beignet shop and improve gas stations owned by certain of the entities. **CHARITY** signed a disbursement sheet stating that the purpose of the loan was to finance renovations to 620 Decatur Street and three gas stations. In truth and in fact, Bank President A applied a significant portion of the loan proceeds to cover **CHARITY**'s overdrafts, which included personal expenses.

11.    In or around December 2015, Bank President A approved a second loan for **CHARITY** for $500,000, falsely stating the proceeds would be used to enclose the outdoor patio at 620 Decatur Street and improve three gas stations. Nominee D was a guarantor on the loan. **CHARITY** signed a disbursement sheet stating that he would use the loan proceeds to finance the renovations to 620 Decatur and three gas stations. In truth and in fact, Bank President A applied the loan proceeds to cover **CHARITY**'s overdrafts, which included personal expenses.

12.    In or around August 31, 2016, Bank President A approved a third loan increase for $500,000 to enclose the outdoor patio at 620 Decatur Street. **CHARITY** signed a disbursement sheet stating that he would use the loan proceeds to enclose the patio. In truth and in fact, Bank President A applied the loan proceeds to cover **CHARITY**'s loan payments and overdrafts, which included personal expenses. Specifically, between August 31, 2016, and December 8, 2016, there were approximately 47 disbursements into **CHARITY**'s account ending in 2440, totaling roughly $476,555.27.

      b.    *Lake Terrace Shopping Center*

13.    In or around 2007, **CHARITY**, through one of the Entities, purchased the Lake Terrace Shopping Center in New Orleans East using loan proceeds from First NBC Bank. **CHARITY** sold the shopping center to a developer in February of 2016.

14.    During the time that **CHARITY** owned the shopping center, **CHARITY** and

Bank President A represented to First NBC Bank that **CHARITY** needed additional loan proceeds to develop the property. Also during this time, **CHARITY** and Bank President A represented to First NBC Bank and others that development of the shopping center was about to begin or that it would soon be completed.

15. Contrary to these representations, the shopping center was never developed and was cited for blight in 2012. As late as December 2015, Bank President A falsely and fraudulently represented to an auditor that the shopping center was under construction or close to being finished. When **CHARITY** sold the shopping center in February 2016, it was in such a state of disrepair that the City of New Orleans included as a condition of the sale that the new owner demolish the property within 60 days of the purchase.

16. Loan proceeds that were supposed to go toward development of the shopping center went into an account controlled by **CHARITY**. **CHARITY** spent money from this account on, among other things, service of his swimming pool and attorney's fees.

*Nominee Loans*

17. Yet another means by which Bank President A, **CHARITY**, and others concealed the true financial condition of **CHARITY**'s loans was by using Nominee D as a guarantor on some of **CHARITY**'s and the Entities' loans. **CHARITY**, Bank President A, and others fraudulently characterized Nominee D as **CHARITY**'s sister and often disbursed loan proceeds falsely representing that Nominee D was willing to guarantee or be the primary borrower on the loan. In truth and in fact, Nominee D was unaware of the true purpose of the loans, many of which were disbursed prior to her signing any loan documentation. Further, she was unaware that the loan proceeds were used to finance **CHARITY**'s personal spending habits and make loan payments.

All in violation of Title 18, United States Code, Section 1349.

## **BANK FRAUD FORFEITURE**

1. The allegations contained in Count 1 of this Bill of Information are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(A).

2. Upon conviction of the offense in violation of Title 18, United States Code, Section 1349 set forth in Count 1 of this Bill of Information, the defendant, **KENNETH CHARITY**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation(s).

3. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 982(a)(2)(A) and 28 U.S.C. § 2461(c).

          MICHAEL M. SIMPSON
          Attorney for the United States
          Acting under authority conferred
          by 28 U.S.C. § 515

          SHARAN E. LIEBERMAN
          Assistant United States Attorney

          MATTHEW R. PAYNE
          Assistant United States Attorney

          NICHOLAS D. MOSES
          Assistant United States Attorney

          J. RYAN MCLAREN
          Assistant United States Attorney

New Orleans, Louisiana
May 15, 2019

No. _____

# United States District Court

FOR THE

EASTERN  DISTRICT OF  LOUISIANA

---

UNITED STATES OF AMERICA

vs.

KENNETH CHARITY

---

BILL OF INFORMATION
FOR CONSPIRACY TO
COMMIT BANK FRAUD

---

Violation: 18 U.S.C. § 1349

Filed _____, 20 19

_____, Clerk.

By _____, Deputy

*Assistant United States Attorney*
SHARAN E. LIEBERMAN