

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 19-90** |
| **v.** | * | **SECTION: "I"** |
| **KENNETH CHARITY** | * | |

* * *

## FACTUAL BASIS

The defendant, **KENNETH CHARITY** ("**CHARITY**"), has indicated that he intends to plead guilty as charged to Count One, that is, conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, of the Bill of Information pending against him.

The United States and **CHARITY** do hereby stipulate and agree that the allegations in the Bill of Information and the following facts are true and correct and that, should this matter have proceeded to trial, the government would have proven them beyond a reasonable doubt, through the introduction of competent testimony and admissible tangible and documentary exhibits. This Factual Basis does not set forth all of the facts known to the United States or **CHARITY** at this time. The limited purpose of this Factual Basis is to demonstrate that there exists a sufficient legal basis for **CHARITY**'s guilty plea. By their signatures below, the parties expressly agree that there is a factual basis supporting the defendant's guilty plea. The parties also agree that this Factual Basis may, but need not, be used by the United States Probation Office and the Court in determining the applicable advisory guideline range under the United States Sentencing Guidelines or the appropriate sentence under 18 U.S.C. § 3553(a).

## INTRODUCTION

## A. FIRST NBC BANK

1. At all times material to the Bill of Information, First NBC Bank was a financial institution, as defined in Title 18, U.S.C. § 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with federally insured deposit accounts.

2. First NBC Bank was established in or about 2006, with its headquarters in New Orleans, Louisiana, which was within the Eastern District of Louisiana, and had branch offices in Louisiana, Mississippi, and Florida.

3. First NBC Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. Bank President A was a founder of First NBC Bank and acted as its President and Chief Executive Officer from on or about May 2006, until on or about December 2016.

4. In or around May 2013, First NBC Holding Company became a publicly-traded company listed on the NASDAQ.

5. On or about April 28, 2017, First NBC Bank was closed by the Louisiana Office of Financial Institutions. The FDIC was named Receiver.

## B. THE PARTIES AND THE LOANS WITH FIRST NBC BANK

6. From a time unknown but in or around February 2007, **CHARITY** had a banking relationship with First NBC Bank where Bank President A acted as **CHARITY**'s loan officer.

7. Nominee D was a physician and friend of **CHARITY** who lived and practiced medicine in the Washington, D.C. suburbs. Nominee D was not **CHARITY**'s sister by blood, marriage, or adoption.

AUSA _[initials]_
Defendant _[initials]_
Defense Counsel _[initials]_

8. Nominee D was the sole member of MO78255, a limited liability company, registered with the Louisiana Secretary of State, and domiciled in Mandeville, LA.

9. **CHARITY** was the sole member of the limited liability companies DMK Group Three, DMK Group Five, 190W1515, DMK Acquisitions & Properties, and 21W104, and had power of attorney to act on behalf of MO78255, collectively "the Entities."

10. Nominee D did not have a bank account at First NBC Bank and was not a signatory on any of the accounts held by **CHARITY** or the Entities at First NBC.

11. From a time unknown, but on or before February 15, 2007, Bank President A acted as the loan officer on Nominee D's loans, **CHARITY's** loans, and the loans belonging to the Entities, collectively "**CHARITY** Loans."

12. By the time First NBC Bank failed in late April 2017, the balance on the **CHARITY** Loans was more than approximately $18 million.

**C. <u>COUNT 1: CONSPIRACY TO COMMIT BANK FRAUD</u>**

13. From in or around July 2007, through in and around November 2016, in the Eastern District of Louisiana and elsewhere, **CHARITY** and others known and unknown, did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States of America, that is: to knowingly, and with intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by and under the custody or control of First NBC Bank, by means of false and fraudulent pretenses, representations, and promises, relating to a material fact.

AUSA ______
Defendant ______
Defense Counsel ______

14. The purpose of the conspiracy was for **CHARITY**, Bank President A, and others to disguise the true financial condition of **CHARITY** and the Entities' by renewing and increasing loans, paying mature loans with new loans, making loan payment with loan proceeds, and using loan proceeds to cover overdrafts. This practice made it falsely appear that **CHARITY** and the Entities' loans were current and that they had no overdrafts.

15. Specifically, **CHARITY**, Bank President A, and others provided First NBC Bank with materially false and fraudulent loan documents, and financial statements, which, among other things, overstated assets, understated liabilities, inflated collateral values, and overstated **CHARITY**'s cash flow. The documents also fraudulently described Nominee D as **CHARITY**'s sister.

**RELATIONSHIP WITH BANK PRESIDENT A**

16. As was the case with a select group of borrowers at First NBC Bank, Bank President A was **CHARITY**'s loan officer and **CHARITY** and his Entities enjoyed a special status at the bank where Bank President A and others regularly circumvented the bank's loan policies to funnel money to un-creditworthy and unqualified borrowers.

17. Employees of First NBC Bank would testify that Bank President A and his administrative staff kept a list of problem borrowers who consistently had overdrafts on their deposit accounts. Rather than charging these borrowers overdraft fees and ultimately terminating their account at the bank, Bank President A fraudulently cured the overdraft status of these problem borrowers by applying loan proceeds to pay the overdrafts, therefore making it appear that these borrowers were servicing their accounts and had sufficient cash flow to pay their recurring bills.

AUSA ____
Defendant ____
Defense Counsel ____

Bank President A's assistants called these borrowers the "D.O.R.K.S." **CHARITY** was the "K" in D.O.R.K.S.

18. Bank President A's daily monitoring of the D.O.R.K.S.'s overdraft status allowed him to use First NBC Bank funds to pay **CHARITY's** overdrafts. This practice ensured **CHARITY** and other D.O.R.K.S. were not on the month-end overdraft report.

19. Bank President A's practice of covering **CHARITY**'s overdrafts was particularly problematic because of his personal knowledge of **CHARITY**'s excessive spending and use of loan proceeds to finance his lifestyle. **CHARITY** regularly signed disbursement statements falsely declaring that the purpose of the loan proceeds were for a certain business purpose but then would use the proceeds for travel, cars, clothing, or his children's private school tuition. Bank President A, **CHARITY**'s loan officer, would monitor the status of **CHARITY**'s accounts on a monthly basis by taking **CHARITY**-related "homework" to his house at night to review. Bank President A completed monthly analyses of **CHARITY**'s accounts, detailing the date, payee, and amount of all transactions and whether they were business or personal. He would also identify loan payments due and overdrafts. He directed his assistants to the specific funds they should use to pay the Charity Loans and overdrafts. Documents show that Bank President A reconciled **CHARITY**'s accounts down to the dollar and was well-aware that **CHARITY** did not spend and demonstrated no intention of spending the loan proceeds for the approved purpose.

20. In heated exchanges with **CHARITY**, Bank President A frequently acknowledged **CHARITY** had insufficient cash flow to pay his loans at the bank. Despite this, Bank President A never put **CHARITY** in default status or foreclosed on any of his collateral.

AUSA ______
Defendant ______
Defense Counsel ______

21. For example, in an email to **CHARITY** dated January 30, 2013, more than six years into **CHARITY**'s loan relationship with First NBC Bank, Bank President A said:

> Ken, read what you wrote and evaluate who is imbecilic. You represented over a dozen times to me that you had the documents signed by [Nominee D] and had sent them to us. Instead, she never sent them as you now admit......is it my fault you didn't pay your taxes over a year ago? Is it my fault you call for money you don't have?......If you don't like my frustration at your consistent inability to carry out the simplest business activities I suggest you move your business to a bank that will give you the level of service you believe you deserve. The way I see it any other bank would have foreclosed on you years ago if you indeed could get a loan from them in the first place......Especially frustrating is that I spent a long time this weekend summarizing all your 2011 business transactions to prepare 2011 financials and tax returns . . . . You think another bank president would do that for a borrower. On second thought, you may be right, I must be an imbecile.

22. Despite acknowledging that any other bank would had "foreclosed on [**CHARITY**] years ago," Bank President A continued to loan **CHARITY** and the Entities funds totaling more than $5.2 million dollars.

23. In or around the Fall of 2016, **CHARITY** and Bank President A participated in a recorded phone conversation that lasted one hour and forty-seven minutes. During the phone call, Bank President A told **CHARITY** repeatedly that he was a liar, incompetent, and did not "do anything that generates any money."

24. **CHARITY**'s bank records would show that **CHARITY** spent over $3 million in loan proceeds on personal items, including country club dues, car purchases, jewelry, and other luxury items. The loan disbursement sheets for these funds stated that they were to be used for

AUSA ______
Defendant ______
Defense Counsel ______

business purposes. Bank President A was aware of the fact that **CHARITY** spent loan proceeds contrary to the purposes stated in the loan documents.

**FALSE PERSONAL FINANCIAL STATEMENTS**

25. On or about July 2010, **CHARITY** and Bank President A knowingly and intentionally submitted false and fraudulent information about **CHARITY**'s assets to First NBC Bank in support of a loan. In the 2010 personal financial statement, Bank President A and **CHARITY** falsely listed a $350,000 trust account and $220,000 in real estate income as assets. **CHARITY** and Bank President A also falsely listed 2.5 million dollars in government subsidiaries as a receivables asset. Both **CHARITY** and Bank President A well-knew these representations were false. Bank President A completed **CHARITY**'s personal income tax returns for the 2010 tax year, listing **CHARITY**'s income as negative $867,221. **CHARITY** did not file a personal income tax return in 2009.

26. On or about May 2011, **CHARITY** and Bank President A knowingly and intentionally submitted false and fraudulent information about **CHARITY**'s assets to First NBC Bank in support of a loan. In the 2011 personal financial statement, **CHARITY** and Bank President A falsely listed a $350,000 trust account and $421,000 in real estate income as assets. Both **CHARITY** and Bank President A well-knew these representations were false. Bank President A completed **CHARITY**'s tax returns for the 2010 and 2011 tax years listing **CHARITY**'s income at negative $867,221 for 2010 and negative $1.1 million for 2011. IRS records show that **CHARITY** did not file a tax return in 2011, but Bank President A prepared a 2011 Tax Return for **CHARITY** and his wife for **CHARITY**'s First NBC Bank loan file.

AUSA ___
Defendant ___
Defense Counsel ___

27. On or about December 2012, **CHARITY** and Bank President A knowingly and intentionally submitted false and fraudulent information about **CHARITY**'s assets to First NBC Bank in support of a loan. In the 2012 financial statement, **CHARITY** and Bank President A falsely listed a trust account in the amount of $350,000 as an asset, and accounts receivable in the amount of $749,000. Bank President A completed **CHARITY**'s tax returns for the 2011 tax year listing **CHARITY**'s income as negative $1.1 million. IRS records show the 2011 return was not filed. **CHARITY** did not file a tax return in 2012.

**LOAN MASKING**

28. Bank President A and others disguised **CHARITY**'s true financial condition by, among other things, issuing new loans to **CHARITY** and the Entities, which would pay older loans that **CHARITY** was unable to repay. The new loans would then appear to be current and performing, while the old loans appeared to have been paid. In reality, **CHARITY** had insufficient income or cash flow to pay his debts at First NBC Bank. Bank President A was well-aware that **CHARITY** had no cash flow or ability to repay his loans at First NBC Bank, but continued to falsely represent in bank records that **CHARITY** and his Entities were profitable. This practice benefitted **CHARITY** because **CHARITY** could continue to live off loan proceeds and was never put in a default status.

AUSA ______
Defendant ______
Defense Counsel ______

## FALSE STATEMENTS REGARDING LOAN PURPOSE

### A. RENTAL PROPERTIES

29. Sometime before December 2007, **CHARITY** purchased several properties in the New Orleans area to develop as rental properties. Several of these properties were never developed and several were never rented, did not have electricity, or had been deemed uninhabitable. Between approximately 2007 and approximately 2016, First NBC Bank advanced hundreds of thousands of dollars to **CHARITY** for renovations to the rental properties. Bank President A was aware that **CHARITY** was not renting many of these properties and spent loan proceeds meant to renovate the properties on personal expenses.

30. Beginning as early as December 5, 2007, Bank President A, Bank Officer B, and Bank Officer C were aware that several of **CHARITY'S** properties were not rented and that **CHARITY** had already spent much of the money that First NBC Bank had lent **CHARITY** to complete the renovations.

31. On December 5, 2007, Bank Officer C sent an interoffice memorandum to Bank President A and Bank Officer B discussing First NBC Bank's loans to **CHARITY** and **CHARITY'S** properties. The memorandum listed multiple properties that caused Bank Officer C "concern."

32. One property discussed in the memorandum, the Vasquez Site, had been the subject of a loan that was supposed to go toward construction expenses and improvements. When Bank Officer C visited the Vasquez Site, there were no workers present and no evidence of dumpsters

or other construction materials. The memorandum noted that at that point (December 2007), First NBC Bank had funded $244,000 against a site valued at $240,000.

33. The memorandum concluded that "all" of **CHARITY**'s projects "have blown budgets and excessive spending" and that "steps must be taken to protect the bank's loan and collateral positions." The memorandum further stated that "significant risks exists [sic] and are continuing to accrue should we not address these situations."

34. **CHARITY** and First NBC Bank continued their loan relationship for approximately nine years after Bank Officer C's memorandum was sent to Bank President A and Bank Officer B, including on loans for properties described in the memorandum. Bank President A, as **CHARITY**'s loan officer at First NBC Bank, approved these loans despite knowing that **CHARITY** did not use the loan proceeds to develop or rent at least seven of the residential properties, which were uninhabitable.

**B. <u>LAKE TERRACE SHOPPING CENTER</u>**

35. Notably, in 2007, **CHARITY**, through one of the Entities, purchased the Lake Terrace Shopping Center in New Orleans using loan proceeds from First NBC Bank. **CHARITY** sold the shopping center to a developer in February 2016.

36. During the time that **CHARITY** owned the shopping center, **CHARITY** and Bank President A represented to First NBC Bank that **CHARITY** needed additional loan proceeds to develop the property. Also during this time, **CHARITY** and Bank President A represented to First NBC Bank and others that development of the shopping center was about to begin or that it would soon be completed.

37. Contrary to these representations, the shopping center was never developed and was cited for blight while **CHARITY** owned it, until 2016, when it was sold. As late as December 2015, Bank President A falsely and fraudulently represented to an auditor that the shopping center was under construction or close to being finished. When **CHARITY** sold the shopping center in February 2016, it was in such a state of disrepair that the City of New Orleans included as a condition of the sale that the new owner demolish the property within 60 days of the purchase.

38. Loan proceeds that were supposed to go toward development of the shopping center went into an account controlled by **CHARITY**. **CHARITY** spent money from this account on, among other things, a service for his swimming pool, attorney's fees, and overdraft fees at First NBC Bank.

39. Nominee D was listed on the loans related to the rental properties, including Lake Terrace Plaza as either a co-borrower or guarantor. Despite her guaranteeing all the loans, **CHARITY** and Bank President A never disclosed to Nominee D that **CHARITY** spent the loan proceeds on personal expenses.

**C. <u>620 DECATUR STREET ENCLOSURE</u>**

40. **CHARITY** and Bank President A also lied about the status of another loan and development project. In July 2008, **CHARITY** through his Entity DMK Group Three, LLC, purchased a commercial unit located at 620 Decatur Street in the French Quarter with loan proceeds. On or about March 30, 2012, **CHARITY** leased the unit to Huey's 24/7 Diner through on or about April 31, 2017.

AUSA ________
Defendant ________
Defense Counsel ________

41. On or about August 27, 2014, Bank president A approved an increase of approximately $980,000 on a line of credit for **CHARITY** and Nominee D.

42. Three days earlier, Bank President A explained in a credit memorandum, which was placed in First NBC Bank's books and records, that the purpose of the increase was to complete the development of two gas stations and property at 620 Decatur Street in New Orleans. Specifically, the credit memorandum represented that $350,000 would be used to enclose a large part of the patio area at 620 Decatur Street. The credit memorandum also stated the project would take four to five weeks, with the goal of being completed by October, in time for convention season. **CHARITY** signed the disbursement request and authorization, representing that the purpose of the loan was to finance renovations to 620 Decatur Street and three gas stations.

43. Despite these representations in First NBC Bank's records, on or around August 29, 2014, Bank President A authorized the initial disbursement of $175,963.10 to cover $175,041.60 in overdrafts in **CHARITY**'s account ending in 8627. **CHARITY** caused the overdrafts to incur by making loan payments, paying personal expenses such as personal credit cards charges, student loans, and jewelry. The funds did not go toward the patio, as promised.

44. Almost a year and a half later, on or about December 27, 2015, Bank President A approved a second increase in the line of credit for **CHARITY** and Nominee D related to the patio enclosure at 620 Decatur Street. This increase was for $500,000.

45. Four days earlier, on or about December 23, 2015, Bank President A drafted a credit memorandum falsely stating that the purpose of the increase was for **CHARITY** and

AUSA ______
Defendant ______
Defense Counsel ______

Nominee D to complete the development of three gas stations and property at 620 Decatur Street. Specifically, the credit memorandum stated that $350,000 of the $500,000 would fund the enclosure of a large part of the patio area at 620 Decatur Street. Bank President A repeated that the project would take four to five weeks, with the goal of being completed by October, in time for convention season.

46. **CHARITY** signed the disbursement request and authorization, falsely representing the specific purpose of the loan was to finance renovations to 620 Decatur Street and three gas stations. The initial $8,077.37 disbursement on or around December 31, 2015 covered the interest for the loan. Between February 3, 2015, and March 31, 2016, there were an additional 18 disbursements totaling approximately $572,434.63, which were used, in part, to pay for legal fees unrelated to Decatur Street, **CHARITY**'s children's tuition, credit card payments for personal expenses, and life insurance policies. The funds did not go toward the patio, as promised.

47. On or about August 31, 2016, Bank President A approved a third increase of $500,000 on the line of credit for **CHARITY** and Nominee D, purportedly to fund the patio enclosure for 620 Decatur Street. The stated purpose for the loan in the credit memorandum dated August 31, 2014, and authored by Bank President A, was to enclose the patio at 620 Decatur Street, costing an estimated $500,000. **CHARITY** signed the disbursement request and authorization representing that the specific purpose of the loan was to finance renovation to 620 Decatur Street to enclose the patio covered patio.

AUSA ____
Defendant ____
Defense Counsel ____

48. Between August 31, 2016, and December 8, 2016, there were approximately 47 disbursements from the line of credit deposited into **CHARITY**'s account ending in 2440, totaling roughly $476,555.27. The funds disbursed included payments for school tuition, personal credit card expenses, life insurance policies, and loan payments. The funds did not go toward the patio enclosure, as promised.

49. From in or around August 2014 through in or around December 2016, Bank President A was aware that **CHARITY** did not spend the loan proceeds for their intended purpose, to enclose the patio. Boxes of documents recovered from Bank President A's house show that he scheduled **CHARITY**'s income and expenses on a monthly basis and was aware that **CHARITY** did not use the loan proceeds to build the enclosure. Records show that Bank President A approved 1.2 million dollars for a $350,000 enclosure that Bank President A knew **CHARITY** never started and never completed.

50. City of New Orleans records and observation of the property confirm that the patio was never enclosed at 620 Decatur Street.

51. Nominee D was listed on the loans related to the enclosure as a guarantor. Despite her being a guarantor, **CHARITY** and Bank President A never disclosed to Nominee D that **CHARITY** spent the loan proceeds on personal expenses.

AUSA ____
Defendant KC
Defense Counsel ____

## NOMINEE LOANS

### A. NOMINEE D

52. At a time unknown but sometime after Hurricane Katrina, **CHARITY** approached Nominee D and asked her if she wanted to enter into a business with **CHARITY** where they would redevelop blighted properties in the New Orleans area. Nominee D agreed, but due to her busy schedule as a practicing physician and her inability to travel between Washington, D.C. and New Orleans with frequency, she signed a limited power of attorney delegating some responsibilities associated with purchasing real estate to **CHARITY**.

53. At a time unknown, Bank President A advised **CHARITY** that he needed the backing of his sister as guarantor in order to receive loans from the bank.

54. Bank President A had his employees "book" loans without receiving signatures from Nominee D. Sometimes Bank President A would approve loans and disburse funds, and then, after the fact, seek Nominee D's signatures.

55. Trusting Bank President A and **CHARITY**, Nominee D often signed documents without reading them or realizing the purpose of the loans.

56. From December 2009 to February 2018, Nominee D sent **CHARITY** more than $900,000 dollars, which was deposited in to **CHARITY**'s account at JP Morgan Chase. **CHARITY** spent a significant portion of the money on his personal expenses and not for business ventures that Nominee D and **CHARITY** had previously discussed.

AUSA ________
Defendant ________
Defense Counsel ________

## B. OLD MILITARY ROAD

57. **CHARITY** requested that Bank President A arrange for First NBC Bank to make several loans to Nominee D. The proceeds from these loans went to **CHARITY** or into bank accounts owned by him, and never went to Nominee D. **CHARITY**'s status at First NBC Bank and his poor credit rating would have made it difficult for **CHARITY** to obtain these loans had they not been in Nominee D's name.

58. For example, in 2012, **CHARITY** used loan proceeds from First NBC Bank to purchase a house on Old Military Road in Covington, Louisiana. **CHARITY** put the offer on the house, signed a contract as a buyer, and the realtors believed that the house was for **CHARITY**. In September 2012, Bank President A wrote a letter addressed to **CHARITY** saying that First NBC Bank would do its best "to position the loan approval" for the Old Military Road home.

59. In October 2012, Bank President A prepared a Credit Memorandum for the Old Military Road loan. In the credit memorandum, Bank President A listed Nominee D as the borrower before scratching out Nominee D's name and replacing it with MO78255, a limited liability corporation for which Nominee D was the only member. The Credit Memorandum falsely stated that Nominee D was **CHARITY**'s sister, even though Nominee D and **CHARITY** were not related, they were college friends. The credit memorandum also falsely stated that Nominee D, who worked as a physician in the Washington D.C. area, sought to buy **CHARITY** a home in Covington, Louisiana, as an "investment property." Bank President A falsely stated in the credit memorandum that the house would be rented to **CHARITY** and his family and would "increase [Nominee D's] cash flow by close to $100,000 by reducing her tax bill." In the credit

AUSA ______
Defendant ______
Defense Counsel ______

memorandum and in a subsequent meeting with the First NBC Bank Board Loan Committee, Bank President A stated that the primary source of repayment for the loan would be cash flow from Nominee D's medical practice.

60. In reality, **CHARITY** contacted Nominee D multiple times to ask if Nominee D would cosign the Old Military Road loan and Nominee D refused. **CHARITY** then told Nominee D that, if she cosigned, her name would come off the loan after one year. At that point, Nominee D agreed to sign the loan based in the name of MO78255 on her understanding that, after one year, her name would be removed. However, **CHARITY** did not ever sign the loan, and the credit memorandum refers to the loan as being a "loan to [Nominee D]." Nominee D's name never came off the loan.

61. **CHARITY** and Bank President A knew that **CHARITY** was not renting the home from Nominee D, despite the fact that Bank President A falsely described that **CHARITY** would be paying Nominee D rent in the Credit Memorandum in the bank's books and records. Further, **CHARITY** and Bank President A knew that Nominee D was not making payments toward the Old Military Road loan. The loan was paid entirely with loan proceeds from other Charity Loans.

**<u>CONCLUSION</u>**

62. **CHARITY** made false statements to First NBC Bank and others in order to fraudulently receive loan proceeds from First NBC Bank. Bank President A facilitated **CHARITY**'s fraud by approving loans despite his knowledge that **CHARITY**'s statements were

AUSA ______
Defendant ______
Defense Counsel ______

false. Bank President A also made his own false statements related to **CHARITY**. **CHARITY**'s and Bank President A's conduct constitute a criminal agreement to defraud First NBC Bank.

**APPROVED AND AGREED TO:**

SHARAN E. LIEBERMAN
NICHOLAS D. MOSES
MATTHEW R. PAYNE
J. RYAN MCLAREN
Assistant United States Attorneys

7/30/19
Date

DYLAN UTLEY
Attorney for Defendant

7/30/2019
Date

Kenneth Charity
KENNETH CHARITY
Defendant

7/30/2019
Date